**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) )   Civil Action No. _____ |
| KRIS KOBACH, in his official capacity as ATTORNEY GENERAL OF THE STATE OF KANSAS, | ) ) ) ) |
| *Defendant*. | ) ) ) |

## VERIFIED COMPLAINT

Plaintiff Novartis Pharmaceuticals Corporation brings this Complaint against Defendant Kris Kobach, in his official capacity as the Attorney General of the State of Kansas, and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for preliminary and/or permanent injunctive relief challenging the constitutionality of certain provisions of Kansas's Senate Bill 28 (S.B. 28).  That state law is an appropriations measure that, in relevant part, purports to dramatically expand the scope of a federal law (known as the 340B Drug Pricing Program, or 340B for short) requiring manufacturers to sell their drugs at steeply discounted prices—as low as one penny—to a specified list of *non-profit* hospitals and federal grantees known as "covered entities." The relevant portion of S.B. 28[1] upends

---

[1] This portion of S.B. 28 is the only provision of the legislation that Novartis challenges.  Where this pleading references S.B. 28, it refers only to this challenged provision.

federal law, requiring manufacturers to provide the federal 340B discount on an unlimited number of transactions involving *for-profit* pharmacies (known as "contract pharmacies").

2.      S.B. 28 is unconstitutional because it is preempted by federal law, including the federal 340B statute and federal laws governing patent protections and drug exclusivity periods. By expanding the number of transactions that trigger the 340B discount under federal law, the state law is both intruding on a field occupied by federal law and frustrating the objectives of Congress. And by limiting the price that manufacturers may charge on an expanded universe of transactions, S.B. 28 disturbs the incentives and burdens carefully calibrated by Congress in order to incentivize drug manufacturers to invest in new drug therapies and participate in Medicare and Medicaid.

3.      Key to understanding this dispute is familiarity with contract pharmacy arrangements. Covered entities hire companies called "third-party administrators" to cull through pharmacy claims data—after the fact—to identify whether any previous dispenses to a given pharmacy's customers may have involved patients of the covered entity. How this determination is made, and whether the pharmacy customer actually ever was a patient of the covered entity at the relevant time, are a mystery.

4.      All of this data-culling and patient-identifying takes place long after the patient has filled their prescription—paying whatever price is required by their insurance—and left the pharmacy. After the third-party administrator flags that a customer of the pharmacy was (or may have been) also a patient of the hospital, the pharmacy places an order to backfill—or "replenish"—the commercial unit dispensed to that individual with one purchased at the 340B price. That unit is then dispensed to the next pharmacy customer who walks in the door, regardless of whether that customer has any relationship with the covered entity. This scheme is known as the "replenishment model."

5.      These third-party administrators often receive a per-drug fee and are thus motivated to identify as many prescriptions as possible as 340B-eligible drugs. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 454 (D.C. Cir. 2024).  And each actor gets a cut of the pie:  "The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457.  There is thus a significant financial incentive for covered entities, contract pharmacies, and third-party administrators to claim the maximum amount of sales as 340B transactions.

6.      The timing of all this is very important.  As noted, the identification of a unit as eligible for the 340B discount takes place long after the patient has already received the drug, which means that it has no effect on whether Kansas patients have access to those drugs.  And because there is no requirement that contract pharmacies or covered entities pass on 340B cost savings to patients, even in those cases where they genuinely are "patients" of the covered entity for 340B purposes, they hardly ever do so.  As a result, the retrospective designation of the dispense as 340B eligible has no effect on the amount patients actually pay for their drugs.

7.      Multiple federal courts have evaluated contract pharmacy arrangements (including the Third Circuit, the D.C. Circuit, and the District Court for the District of Columbia) and held that the federal 340B law does *not* require manufacturers to recognize an unlimited number of contract pharmacies.  This was a deliberate choice by Congress to limit the scope of the discount obligation. *Sanofi Aventis U.S. v. United States Dep't of Health & Human Servs.*, 58 F.4th 696, 704 (2023) ("Congress's use of the singular 'covered entity' in the 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies.").  Yet by requiring manufacturers to extend the 340B discount on a limitless number of contract pharmacy arrangements, Kansas is attempting to

mandate what Congress itself specifically chose not to require as a condition of participation in 340B (and by extension, Medicare and Medicaid). This has the effect of greatly expanding the scope of the federal discounting obligation. For that reason, the Kansas statute does not merely regulate "delivery" of drugs—it regulates pricing.

8.      S.B. 28 further conflicts with the federal 340B enforcement process by purporting to create its own state-level 340B enforcement mechanism. Congress created two exclusive pathways to resolve disputes arising under the 340B statute: (i) direct enforcement by federal agencies, and (ii) an Administrative Dispute Resolution process that serves as the exclusive means for regulated entities to bring narrow types of private claims relating to 340B law. Both of these enforcement pathways are overseen by the federal Health Resources and Services Administration (HRSA), which has specialized expertise in this area. HRSA is a division of the federal Department of Health and Human Services (HHS), which oversees the interrelated 340B and the Medicaid programs in a complimentary way. Congress gave no authority to the States to administer, interpret, or enforce any aspect of the 340B Program. Yet S.B. 28 purports to do exactly that, undermining Congressional objectives.

9.      The Kansas law is also preempted by federal laws governing the timing of drug approvals, including federal patent laws and the Food, Drug, and Cosmetic Act (FDCA) as amended by the federal Drug Price Competition and Patent Term Restoration Act (commonly known as the Hatch-Waxman Act). In these statutes, Congress spelled out a grand bargain: Brand name manufacturers are driven to research, develop, and bring to market pharmaceutical products on the promise that they will obtain federally protected, exclusive rights to sell their products at market prices for specified periods of time. Once those periods expire, generic manufacturers are permitted to rely upon the drug development work done by innovator manufacturers in order to

obtain streamlined approval of generic products.  S.B. 28 requires Novartis to sell its drugs that are not covered by the federal 340B laws at heavily discounted prices *before* those federally protected exclusivity periods have run, undermining the bargain carefully constructed by federal patent and drug laws.  That too frustrates the purposes of Congress.

10.     Absent judicial intervention, Novartis will suffer irreparable harm.  So long as the law remains in effect and is permitted to be enforced, Novartis will risk violating Kansas law merely by continuing to implement a contract pharmacy policy that has already been expressly declared lawful by other federal courts applying the federal 340B law.  That would cause Novartis to suffer severe irreparable harm and loss of its constitutional rights on an ongoing basis.  Novartis therefore requests an injunction enjoining enforcement of S.B. 28.

## PARTIES

11.     Plaintiff Novartis is a corporation organized in Delaware with its principal place of business at 59 Route 10, East Hanover, New Jersey 07936.  Novartis's purpose is to reimagine medicine to improve and extend people's lives.

12.     Defendant Kris Kobach is the Attorney General for the State of Kansas and is responsible for administering and enforcing the provisions of S.B. 28.  Defendant Kobach maintains offices at 120 SW 10th Avenue, 2nd Floor, Topeka, Kansas 66612.

## JURISDICTION AND VENUE

13.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States, and under 28 U.S.C. §§ 2201–02, in that there exists an actual justiciable controversy between the parties as to which Plaintiff requires a declaration of its rights by this Court and injunctive relief.

14.     This Court also has inherent equitable powers to enjoin the actions of state officials that contradict the U.S. Constitution and federal law.  *Ex parte Young*, 209 U.S. 123, 159–160 (1908); *Elephant Butte Irrigation Dist. of New Mexico v. Department of Interior*, 160 F.3d 602, 609–613 (10th Cir. 1998); *Marie v. Moser*, 65 F. Supp. 3d 1175, 1193–94 (D. Kan. 2014).

15.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant maintains offices in Topeka, Kansas, which are in this district, and/or because a substantial part of the events or omissions giving rise to the claim occurred in this district.  S.B. 28 purports to restrict Novartis's conduct in this district, and a substantial amount of Novartis's drug products are sold in this district.  The challenged state law also applies to contract pharmacy arrangements in this district.  S.B. 28 is therefore likely to be enforced against manufacturers in this district.

## FACTUAL BACKGROUND

### I. Statutory and Regulatory Background

16.     Congress created the 340B Drug Pricing Program in 1992.  The program requires participating pharmaceutical manufacturers to provide deep discounts on certain drugs to specified types of healthcare providers—known as "covered entities"—as a condition of the availability of federal payments for such drugs under Medicaid and Medicare Part B.  42 U.S.C. § 256b.

17.     At its core, the 340B Program requires a participating pharmaceutical manufacturer to charge a covered entity no more than the 340B ceiling price—a discounted price calculated under a prescribed statutory formula—for each unit of a covered outpatient drug, under specified circumstances.  *Id.* §§ 256b(a)(1), (a)(4), (b)(1).  A participating manufacturer "shall . . . offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  *Id.* § 256b(a)(1).

18.     The 340B Program is overseen by HHS and its sub-agency, HRSA. To participate in the 340B Program, a manufacturer must enter a Pharmaceutical Pricing Agreement (PPA) with the federal government. *Id.*

19.     The "applicable ceiling price," or "340B price," is a steeply discounted price—as low as one penny—calculated under a prescribed statutory formula. *See* 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1210, 1214-15 (Jan. 5, 2017); 42 U.S.C. § 256b(a)(2).

20.     Congress intentionally limited the scope of sales that would trigger such an extraordinary discount to those drugs "purchased by a covered entity."  42 U.S.C. § 256b(a)(1). The statute carefully defined the term "covered entity" in a specific and exhaustive way, listing 15 types of entities that qualify for the discount.  *Id.* § 256b(a)(4) (listing federal grantees, such as black lung clinics and family planning clinics, and specified types of non-profit hospitals).  The statute does not require that the 340B discount be given to entities not included within the definition of "covered entity."

21.     That is exactly how the program worked at first:  Non-profit covered entities purchased drugs at the 340B price, and enjoyed the savings from the discount.  But over time, covered entities sought to contract with third-party *for-profit* pharmacies (so-called "contract pharmacies") in order to claim the 340B discount on their sales as well.

22.     Here's how contract pharmacy arrangements work.  Covered entities hire third-party administrators to cull through pharmacy claims data—after the fact—to identify whether any previous dispenses to individual pharmacy customers may have involved patients of the covered entity.  How this determination is made, and whether the pharmacy customer actually ever was a patient of the covered entity at the relevant time, is a mystery.  All of this data-culling and patient-

identifying takes place long after the patient has filled their prescription and left the pharmacy. After the third-party administrator flags that a customer of the pharmacy was (or may have been) also a patient of the hospital, the pharmacy places an order to backfill—or "replenish"—the commercial unit with one purchased at the 340B price. That unit is then dispensed to the next pharmacy customer that walks in the door. The 340B replenishment unit is thus treated as if it had been purchased at the commercial price—and is available for dispensing to anyone, regardless of whether they have a relationship with the covered entity—even though it has in fact been purchased at the 340B price. *See Novartis*, 102 F.4th at 461–463; *see also HHS OIG, Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431 at 5 (Feb. 4, 2014), *available at* https://oig.hhs.gov/oei/reports/oei05-13-00431.pdf. This scheme is known as the "replenishment model."

23. These third-party administrators often receive a per-drug fee and are thus motivated to find as many potentially 340B-eligible drugs as possible. *See id.*; *Novartis*, 102 F.4th at 454. And each actor gets a cut of the pie: "The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457. There is thus a significant financial incentive for covered entities, contract pharmacies, and third-party administrators to identify the maximum amount of sales as 340B transactions.

24. The timing of all this is very important. All the haggling over 340B drug discount eligibility takes place after the patient has already received the drug, which means that it has no effect on whether patients are able to access Novartis drugs. And because there is no requirement that contract pharmacies or covered entities pass on 340B cost savings to individuals, even in the

cases where they genuinely are 340B patients, they hardly ever do so, which means that the after-the-fact designation of the drug as 340B eligible has no effect on any amount that the patient pays.

25.     As the D.C. Circuit observed, these partnerships "have left the section 340B program vulnerable to abuse—at great cost to the manufacturers." *Novartis*, 102 F.4th at 455.  For that reason, manufacturers like Novartis have imposed their own distribution terms on 340B priced units, such as reasonable limits on the number of contract pharmacies to which manufacturers will deliver drugs priced at the 340B discount.  The D.C. Circuit and Third Circuit blessed these restrictions as lawful, noting that Congress's silence on the issue is not a gap to be filled, but rather Congress's considered judgment not to require the 340B discount on such sales.  *Novartis*, 102 F.4th at 460 (340B's "statutory silence implies that private parties may act freely"); *Sanofi Aventis*, 58 F.4th at 707 (because Congress explicitly contemplated sales through contract pharmacies in an unrelated adjacent statutory provision, and elected not to do so for Section 340B, "[w]e presume that it did so intentionally.").

26.     The statute provides for only two enforcement mechanisms for manufacturer refusals to give the discount when warranted.  First, the statute provides for the imposition of civil monetary penalties (CMPs) on manufacturers that knowingly and intentionally charge a covered entity a price for a 340B drug that exceeds the ceiling price.  42 U.S.C. § 256b(d)(1)(B)(vi)(III).  HHS has delegated the implementation of this statutory remedy to the HHS Office of Inspector General (OIG).

27.     In addition, the federal 340B statute required HHS to promulgate regulations establishing an ADR process to resolve specific categories of private disputes between covered entities and manufacturers arising under the 340B Program.  42 U.S.C. § 256b(d)(3).  The statute specifically describes two narrow claim categories that are funneled to administrative dispute

resolution: (1) claims by covered entities that they have been overcharged for 340B drugs, and (2) claims by manufacturers relating to duplicate discounts and drug diversion.  42 U.S.C. § 256b(d)(3)(A).  In promulgating ADR regulations, the agency has interpreted the statute—rightly or wrongly—to include a claim "that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."  89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024).

28.     There are no other enforcement mechanisms contemplated by the 340B statute.

**II.  HRSA's Changing Position on Contract Pharmacies**

29.     Over time, HRSA's position on contract pharmacies has evolved.

30.     In 1996, the agency issued guidance announcing that the agency would not preclude covered entities lacking an in-house pharmacy from entering into a contractual relationship with a single outside pharmacy to dispense covered outpatient drugs to the covered entity's patients.  61 Fed. Reg. 43,549 (Aug. 23, 1996).

31.     In 2010, HRSA issued revised guidance on contract pharmacy arrangements, stating that covered entities may be permitted to "use" an untold number of "multiple pharmacy arrangements"—with no limits on their physical location, and even if the covered entity had its own in-house pharmacy—"as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition."  75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).  HRSA's 2010 Guidance thus purported to authorize covered entities to enter into a limitless number of contract pharmacy arrangements.

32.     That decision had striking consequences.  Over the ensuing years, the number of contract pharmacies receiving and dispensing 340B drugs grew at a rapid clip.  By 2018, the Government Accountability Office found that the number of contract pharmacies had ballooned

from 1,300 in 2010 and to nearly 20,000 by 2017.  Government Accountability Off., *Drug Discount Program, Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, at 36 (June 2018), https://www.gao.gov/assets/gao-18-480.pdf.  This report echoed findings from the HHS OIG, which similarly documented dramatically increased use—and abuse—of 340B discounts through covered entities' contract pharmacy relationships.  HHS OIG, *Memorandum Report:  Contract Pharmacy Arrangements in the 340B Program*, No. OEI-05-00431 at 9–10, 16 (2014), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

33.     Neither covered entities nor their contract pharmacies are required to pass on 340B discounts to patients, and often they do not.  Instead, covered entities and contract pharmacies are permitted to (and generally do) pocket the discount themselves.  Over time, 340B expenditures have swelled as contract pharmacy arrangements, and the profits they generate for covered entities and contract pharmacies alike, proliferated.  By 2020, sales of 340B units constituted an estimated 7% of the entire U.S. prescription drug market and 17% of total U.S. branded outpatient drug sales.  Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments* (Oct. 14, 2021), *available at* https://healthpolicy.usc.edu/research/the-340b-drug-pricing-program-background-ongoing-challenges-and-recent-developments;  Eleanor  Blalock, *Measuring the Relative Size of the 340B Program: 2020 Update* (June 2022), *available at* https://media.thinkbrg.com/wp-content/uploads/2022/06/30124832/BRG-340B-Measuring-Relative-Size-2022.pdf.  In 2022, discounted purchases under the 340B Program hit a record high of approximately $54 billion—a more than 22% year-over-year increase.  *Id.*; *see also* Adam J. Fein, *The 340B Program Reached $54 Billion in 2022—Up 22% vs. 2021*, Drug Channels (Sept. 24, 2023).

### III. Novartis's Contract Pharmacy Policy and Resulting Litigation

34.     Concerned about ever-increasing abuse through fast-multiplying contract-pharmacy arrangements, in late 2020, Novartis notified HRSA of its plans to implement a contract pharmacy policy.  Beginning in November 2020, Novartis explained, it would recognize all contract pharmacies within 40 miles of a covered entity—an area of more than 5,000 square miles—and allow covered entities to seek exemptions based on individual circumstances. Novartis's 40-mile limitation did not apply to covered entities that are federal grantees.

35.     In early 2021, HRSA issued a violation letter to Novartis, contending that Novartis's policy violated the statute and demanding immediate compliance with HRSA's view that, at the unilateral direction of a covered entity, a manufacturer is obligated to deliver 340B drugs to any contract pharmacy, on pain of an enforcement action.

36.     Upon receiving HRSA's violation letter, Novartis immediately challenged the agency action in the U.S. District Court for the District of Columbia.  *See Novartis Pharms. Corp. v. Espinosa*, No. 1:21-cv-01479 (D.D.C.) (filed May 31, 2021).  Novartis's challenge was heard alongside a later case brought by United Therapeutics, which had also received a violation letter. *See United Therapeutics Corp. v. Espinosa*, No. 1:21-cv-01686 (D.D.C.).

37.     Following full briefing and argument, the District Court vacated HRSA's violation letters and issued a decision rejecting HRSA's purported requirement that manufacturers recognize an unlimited number of contract pharmacies as inconsistent with the language of the 340B statute. *Novartis Pharms. Corp. v. Espinosa*, No. 21-CV-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021). As the District Court explained, HRSA's enforcement letters rested on the contention that the 340B statute "prohibit[s] drug manufacturers from attaching any conditions to the sales of covered drugs through contract pharmacies," but that the 340B statute does no such thing. *Id.* at *9.  In sum, the

District Court held that "[t]he statute's plain language, purpose, and structure do not prohibit drug manufacturers from attaching *any* conditions to the sales of covered drugs through contract pharmacies." *Id.*

38.     On May 21, 2024, the D.C. Circuit affirmed, holding that the federal 340B statute's "requirement to 'offer' drugs at a certain 'price' does not prohibit distribution conditions, much less require the offeror to accede to any distribution conditions, much less require the offeror to accede to any distribution terms demanded by the offeree." *Novartis*, 102 F.4th at 461.  The D.C. Circuit also noted that statutory silence on contract pharmacies does not mean that manufacturers are required to recognize an unlimited number of them.   "Statutory silence implies that manufacturers *may* impose distribution conditions by contract, not that they are prohibited from doing so." *Id.* at 460.  The Court thus held that Novartis's contract pharmacy policy does not violate the federal 340B statute, and affirmed the vacatur of HRSA's violation letter.

39.     In a parallel lawsuit brought by other drug manufacturers, the U.S. Court of Appeals for the Third Circuit likewise rejected the notion that Section 340B requires manufacturers to recognize an unlimited number of contract pharmacy arrangements.  *See Sanofi Aventis*, 58 F.4th 696.  The unanimous Third Circuit panel held unlawful HHS's efforts to enforce its interpretation of Section 340B against drug manufacturers that imposed delivery conditions on sales to covered entities using contract pharmacies.  *Id.* at 699.  In so doing, the Third Circuit held that "Section 340B does not require delivery to an unlimited number of contract pharmacies." *Id.* at 703.  It identified multiple structural indicators that not only confirmed this reading of Section 340B but further confirmed  Congress's intent that unlimited contract pharmacies *not* be required.

40.     Critically, the Third Circuit noted that "[n]owhere does Section 340B mention contract pharmacies," and inferred based on the language and structure of the statute that

Congress's decision to omit contract pharmacies was not an unintentional gap, but rather an intentional one.  The Court noted, Congress "expressly contemplate[d] drug makers selling discounted drugs through contract pharmacies" in an adjacent provision of the same authorizing legislation relating to another (non-340B) program, but did not include similar language for the 340B program.  *Id.* at 703–705.

41.     The Third Circuit also rejected the argument that manufacturers are required to deliver their 340B drugs anywhere that covered entities wish, including to third-party contract pharmacies, as "one giant leap from the text."  *Id.* at 704.  To the contrary, "Congress's use of the singular 'covered entity' in the 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies."  *Id.*  Because the "drug makers' restrictions on delivery to contract pharmacies [did] not violate Section 340B," the Third Circuit "enjoin[ed] HHS from enforcing against them its reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies."  *Id.* at 706.

42.     Following both the D.C. District Court's and the Third Circuit's decisions, Novartis announced in April 2023 that it was revising its contract pharmacy policy, effective May 3, 2023.  In keeping with both decisions, Novartis's current policy permits hospital covered entities lacking an in-house pharmacy to select a single contract pharmacy location.  Novartis also recognizes any arrangements a hospital covered entity might have with contract pharmacies that the covered entity fully owns and controls.  Federal grantee covered entities continue to be exempt.  Novartis's revised policy mirrors one of the manufacturer policies that the Third Circuit found lawful, and has now also specifically been found lawful by the D.C. Circuit.

**IV. Kansas Enacts Its Own "340B" Legislation.**

43.     On April 24, 2024, Kansas enacted S.B. 28, which states in relevant part that a manufacturer cannot "[d]eny, restrict, prohibit or otherwise interfere with the acquisition of a 340B drug by or delivery of a 340B drug to a pharmacy that is under contract with a 340B-covered entity and authorized under such contract to receive and dispense 340B drugs on behalf of the 340B covered entity, unless such receipt and dispensing of 340B drugs by such pharmacy is prohibited by the United States department of health and human services." S.B. 28 § 32(g)(1)(A).[2]

44.     The law sweeps broadly:  A manufacturer or distributor also shall "not interfere with a pharmacy that has a contract with a 340B covered entity." S.B. 28 § 32(g)(1)(B).  The statute addresses both acquisition and delivery.

45.     The key aspect of the law is not that it requires delivery; it is that is requires delivery of a "340B drug."  A "340B drug" is defined as a covered outpatient drug "that has been subject to any offer for reduced prices by a manufacturer pursuant to the federal 340B drug pricing program authorized by 42 U.S.C. § 256b and is purchased by a covered entity." S.B. 28 § 32(g)(2)(B).  In other words, a "340B drug" is a drug that is sold at a 340B discount.

46.     Putting these provisions together, the Kansas statute requires manufacturers like Novartis to provide the 340B discount on transactions that involve contract pharmacies.  This is not a statute that merely regulates delivery.

47.     A manufacturer in violation of S.B. 28 faces penalties on numerous fronts.

48.     A violation of S.B. 28 constitutes an unfair, abusive, or deceptive trade practice under the Kansas Consumer Protection Act ("KCPA"), *see* Kan. Stat. Ann. § 50-623 *et seq.*, subject to a spate of specified enforcement actions and penalties.

---

[2] *Available at* sb28_enrolled.pdf (kslegislature.org).

49.     The KCPA provides for a fine of up to $20,000 for each knowing and willful violation by a supplier.  *See* Kan. Stat. Ann. § 50-623.

50.     The law imposes criminal penalties as well:  A person who knowingly and willfully violates the KCPA is guilty of a Class C misdemeanor.  Kan. Stat. Ann. § 50-622.

51.     S.B. 28 imposes other costs on would-be violators vis-à-vis its reference to the KCPA, which provides that, if the Attorney General subpoenas matter outside the state, "the person subpoenaed may either make it available to the attorney general at a convenient location within the state *or pay the reasonable and necessary expenses* for the attorney general or the attorney general's representative to examine the matter at the place where it is located."  Kan. Stat. Ann. § 50-631(b) (emphasis added).

52.     The KCPA vests additional powers with the Kansas Attorney General if "[t]he attorney general has reason to believe that a supplier has engaged . . . in an act or practice that violates this act," including "[a]dminister[ing] oaths and affirmations, subpoena witnesses or matter and collect evidence."  Kan. Stat. Ann. § 50-631(a).

53.     In short, the penalties for a violation of S.B. 28 are dire.

## **S.B. 28 IS UNLAWFUL**

54.     S.B. 28 violates the Supremacy Clause of the U.S. Constitution, under both field and conflict preemption principles.

### *Field Preemption*

55.     Field preemption exists where (1) Congress's "framework of regulation [is] 'so pervasive' " that Congress has "left no room for the States to supplement it," or (2) where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  State statutes that diminish federal control over enforcement, and detract from a unified regulatory scheme that Congress has established, are especially likely to violate the Supremacy Clause under field preemption principles.  *See e.g., Colorado Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States*, 693 F.3d 1214 (10th Cir. 2012).

56.     The 340B Program is just that sort of integrated federal regulatory scheme.  It is a creature of a federal statute in which Congress has set out comprehensive regulatory parameters and supplied an exclusively federal framework for enforcement and dispute resolution.  The 340B statute carefully defines the types of entities that are entitled to receive the 340B discount, and provides its own enforcement pathways for violations of the statute, including civil penalty assessments, administrative appeal pathways, and audits initiated by the agency and/or manufacturers.  *See* 42 U.S.C. §§ 256b(a) and (d)(3)(A)–(B).  For that reason, the Supreme Court has held that the federal 340B program is to be administered—and enforced—solely by or through the federal government.  *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011).

57.     The federal statute left no room for states to tinker with the requirements or bolster the enforcement of federal 340B law.  The federal 340B statute mentions states only in passing and even then only in a limited way.  For example, the definition of covered entity includes hospitals that are "owned or operated by a unit of State or local government"; "State-operated AIDS drug purchasing assistance program[s] receiving" certain federal "financial assistance"; and "entit[ies] receiving [federal] funds" to treat sexually transmitted diseases or tuberculosis "through a State or unit of local government" are all federally defined covered entities.  42 U.S.C. §§ 256b(a)(4)(E), (K), (L)(i).

58.     By purporting to create a separate, state-specific pathway that adjusts the contours of the federal 340B requirements—altering when the discount is owed, and overriding federal restrictions on who can enforce it—S.B. 28 runs afoul of the Supreme Court's admonition that using state law to enforce federal 340B requirements is "incompatible with the statutory regime." *Astra*, 563 U.S. at 113.  Congress has left "no room for the States to supplement it[s]" federal regulatory scheme.  *Arizona*, 567 U.S. at 399.

59.     Field preemption also exists when a federal interest is so dominant that it must be assumed the federal system precludes enforcement of state laws covering the same subject. *Southwestern Bell Wireless Inc. v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 199 F.3d 1185, 1190 (10th Cir. 1999).  The federal interests in overseeing and enforcing the 340B Program could hardly be more dominant.  Congress directed HHS to create a comprehensive remedial scheme, one which allows for federal enforcement as well as private ADR claims "to prevent overcharges and other violations of the discounted pricing requirements" and to govern disputes over 340B discount pricing.  42 U.S.C. §§ 256b(d)(1)(A), (d)(2)(A), (3); 42 C.F.R. §§ 10.3, 10.20.  Just as private lawsuits by state actors seeking to apply state common law to enforce 340B requirements are "incompatible with the [340B] statutory regime," so too is a state statute purporting to do the same thing.  *Astra*, 563 U.S. at 113.

***Conflict Preemption***

60.     S.B. 28 also is preempted by the federal 340B statute under conflict preemption principles.  State laws are preempted under conflict principles where they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  Conflict preemption is also found when a state law "interferes with the methods by which the federal statute

was designed to" achieve those purposes and objectives. *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987).

*By Federal 340B Statute*

61.     The Kansas law is preempted by the federal 340B statute under conflict preemption principles, in two ways.

62.     First, S.B. 28 conflicts with federal law by purporting to unilaterally expand the universe of 340B-eligible sales well beyond those required by the statute itself.  As the D.C. Circuit, the Third Circuit, the District Court for the District of Columbia, and the District Court for the District of Delaware recognized, the federal 340B statutory scheme does not require that a drug manufacturer honor unlimited contract pharmacy arrangements demanded by covered entities. *See Sanofi Aventis*, 58 F.4th at 703; *see also Novartis Pharms. Corp.*, 2021 WL 5161783, at *6.  By Congressional design, whether to recognize covered entities' contract-pharmacy arrangements is purely a matter of manufacturer discretion.  As the Third Circuit and D.C. Circuit have both found, Congress's decision not to require unlimited use of contract pharmacies was not a statutory gap, but an intentional decision to limit the scope of the 340B requirements.  Yet in direct contravention of Congress' choice, S.B. 28 purports to require manufacturers to make their 340B drugs available in connection with an unlimited number of contract pharmacy arrangements. This creates a conflict with federal law as interpreted by multiple courts.   S.B. 28 does not supplement federal law, it supplants it.

63.     In addition, S.B. 28 conflicts with the exclusive enforcement mechanism spelled out in the 340B statute.  Congress made its intent plain:  The federal 340B program must be enforced through a specialized federal administrative agency, and only that agency, through one of two centralized administrative processes: one driven by federal actors pursuing CMPs and other

penalties, and the other driven by private claimants who file specified types of ADR claims before HRSA.

64.     In *Astra*, county-operated 340B facilities filed a lawsuit against various drug manufacturers, alleging that they were charging prices in excess of those permitted under the manufacturers' PPAs.  563 U.S. 110.  The plaintiffs' claims were styled as third-party beneficiary claims for breach of contract.  The Court rejected the plaintiffs' attempt to manufacture a private right of action for violations of the 340B statute, noting: "Congress placed the Secretary (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions.  That control could not be maintained were potentially thousands of covered entities permitted to bring suits alleging errors in manufacturers' price calculations."  *Id*. at 114.

65.     As with the common law remedy that the Supreme Court rejected in *Astra*, S.B. 28 erects a substantial obstacle to the centralized federal process by creating a separate enforcement pathway for covered entities outside of the federal enforcement process.  Kansas's law flouts the oversight scheme mandated by Congress and allows covered entities to bypass the otherwise exclusive federal enforcement pathways specifically prescribed by Congress.  For all these reasons, S.B. 28 is unenforceable under the Supremacy Clause.  *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 326 (2016).

*By Federal Laws Governing Drug Exclusivity Periods and Patent Rights*

66.     Finally, S.B. 28 is preempted by federal laws governing patent protection and regulatory exclusivity periods for drug products.  Congress has plenary authority under the U.S. Constitution to establish and oversee the patent laws, which provide a system of incentives "[t]o promote the Progress of Science and useful Arts."  Art. I, § 8, cl. 8.  In 1984, Congress enacted the "Hatch-Waxman" amendments to the FDCA, which among other things created a framework for

patent litigation between brand manufacturers and generic manufacturers.  Under the resulting framework, innovative manufacturers are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected 'exclusive right'" to sell their inventions for a limited period.  *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1371–74 (Fed. Cir. 2007) ("*BIO*").

67.     These patent exclusivity periods are distinctively federal and leave no room for state interference.  "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc*., 489 U.S. 141, 152 (1989); *Southeastern Pennsylvania  Transp. Auth. v. Gilead Scis., Inc*., 102 F. Supp. 3d 688, 703 (E.D. Pa. 2015) ("Federal patent law contemplates the tradeoffs between exclusivity and access, and plaintiffs cannot use state law to adjust that balance by forcing Gilead to lower its prices or disgorge profits from the sale of its patented drugs.").

68.     State laws that cap or fix the prices at which patented drugs may be sold are preempted by federal patent law because they attempt to re-balance the carefully constructed federal statutory scheme that allocates rewards and incentives to innovator manufacturers.  *See, e.g.*, *Pharmaceutical Rsch. & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 60 (D.D.C. 2005), *aff'd sub nom. Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1371–74 (Fed. Cir. 2007) ("*BIO*").

69.     In *BIO*, the Federal Circuit held that a D.C. law that capped the price of patented pharmaceutical products was preempted by the federal patent laws.  *See BIO*, 496 F.3d 1362. "Inventors are impelled to invest in creative effort by the expectation that, through procurement of a patent, they will obtain a federally protected 'exclusive right' to exclude others from making, using, or selling embodiments of their invention."  *Id.* at 1372.  The Court noted that the legislative

history of the Hatch-Waxman Act supports this goal:  "Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling an invention.  They enable innovators to obtain greater profits than could have been obtained if direct competition existed. These profits act as incentives for innovative activities."  *Id.* at 1373 (citing legislative history). The Court thus found that the "underlying determination about the proper balance between innovators' profit and consumer access to medication, though, is exclusively one for Congress to make"—and a state may not "re-balance the statutory framework of rewards and incentives insofar as it relates to inventive new drugs."  *Id.* at 1374.  "By penalizing high prices—and thus limiting the full exercise of the exclusionary power that derives from a patent—the District has chosen to re-balance the statutory framework of rewards and incentives insofar as it relates to inventive new drugs."  *Id*.  The Court thus found the D.C. law preempted.

70.     The same delicate balance underlies the federal exclusivity periods awarded to drugs as part of the drug approval process.  Congress has spelled out a grand bargain: Manufacturers are driven to research, develop, and bring to market pharmaceutical products through a rigorous New Drug Application pathway, which requires manufacturers to submit evidence of clinical trials showing safety and efficacy.  Brand name manufacturers do so on the promise that they will obtain a federally protected, exclusive right to sell their products at market prices for a specified period of time after approval, known as a "regulatory exclusivity period."

71.     Congress thus directed the Food and Drug Administration (FDA) to recognize various periods of market exclusivity following approval of new drugs in order to reward manufacturers for innovation undertaken at considerable risk and expense.  *See* 21 U.S.C. §§ 355(c)(3)(E)(ii), (j)(5)(F)(ii) (five years exclusivity for new chemical entities not previously approved by the FDA); *id.* § 355(c)(3)(E)(iii)-(iv), (j)(5)(F)(iii)-(iv) (three years exclusivity to

reward additional clinical testing for new indications or to develop new dosages); *id.* § 355a (six months additional exclusivity for pediatric clinical testing); *id.* § 360cc (seven years exclusivity for "orphan drugs" used to treat rare diseases).

72.    Once those exclusivity periods expire, generic manufacturers are permitted to utilize the drug development work done by innovator manufacturers in order to obtain streamlined approval of generic products—without the need to show safety or efficacy through clinical trials. The public reaps the benefit of immediate access to a new product during the innovator manufacturer's exclusivity period, and cheaper products once those periods expire.

73.    By requiring Novartis and other manufacturers of brand-name drugs to offer the steep 340B discount on sales made through state law-mandated contract pharmacy arrangements, even during the marketing exclusivity periods they are due under federal law, S.B. 28 impermissibly diminishes the reward that federal law confers on manufacturers, which in turn redounds to the benefit of patients who gain access to Novartis's life-saving and life-sustaining drug products.

**V. S.B. 28 Will Cause Concrete and Imminent Harm to Novartis.**

74.    Novartis will be irreparably harmed unless this Court enjoins Defendant from enforcing S.B. 28.

75.    First, if S.B. 28 is not enjoined, Novartis will be exposed to unconstitutional state-law obligations, and will risk violating Kansas law by continuing with a policy that fully complies with federal law (as determined by multiple federal courts).  A regulated entity may be irreparably injured in the face of the threatened enforcement of a preempted law.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

76.     Failure to comply with the state law will also subject Novartis to state administrative enforcement proceedings that are themselves unlawful and unconstitutional.  These state pathways deprive Novartis of its rights under the carefully crafted, federally defined terms of the 340B Program enforcement pathways.  These deprivations of constitutional rights constitute irreparable injury for purposes of a preliminary injunction.

77.     Novartis also faces the prospect of significant financial penalties for violations of S.B. 28.  As noted above, the state statute contemplates civil and criminal penalties totaling of up to $20,000 per violation, plus the potential for imprisonment.  *See* S.B. 28.  Novartis thus risks exposure to fines totaling millions of dollars per year plus imprisonment.  Payment of such fines will divert resources away from Novartis's research and development of new drug therapies for critical patient populations.  Once lost, drug development research opportunities and market-leading opportunities can never be fully regained.

78.     If Novartis tries to avoid these stringent fines and financial penalties by coming into compliance with the state statute, Novartis faces the loss of millions of dollars in unconstitutional state-mandated discounts per year.  Novartis has no readily apparent way to recover these unlawfully mandated discounts once given.  In fact, HRSA's position is that a manufacturer may seek recovery through the federal ADR process only on claims relating to duplicate discounts and drug diversion.  42 U.S.C. § 256b(d)(3)(A).

79.     Granting injunctive relief here would not harm Defendant, as it is well-established that states maintain no interest in enforcing a statute that violates federal law.

80.     Injunctive relief also would serve the public interest.  The public has a substantial interest in seeing that federal law is enforced and not countenancing state efforts to reset the metes

and bounds of participation in federal healthcare programs and to discourage pharmaceutical innovation that meets patients' needs.

## CLAIMS FOR RELIEF

### COUNT I
### (Declaratory/Injunctive Relief—
### Preemption By Federal 340B Law)

81.  Novartis realleges, reasserts, and incorporates by reference herein each of the foregoing allegations as though set forth fully herein.

82.  The Supremacy Clause of the U.S. Constitution provides that Federal law is "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

83.  S.B. 28 is preempted by the federal 340B statute under both field preemption and conflict preemption principles.

84.  First, S.B. 28 is preempted because it attempts to regulate in a field that Congress has fully occupied.  In crafting the 340B statute, Congress created a comprehensive and self-contained federal regime—one that carefully defines the types of entities that are entitled to receive the 340B discount, and provides its own enforcement pathways for violations of the statute, including civil penalty assessments, administrative appeal pathways, and audits initiated by the agency and/or manufacturers.  *See* 42 U.S.C. §§ 256b(a) and (d)(3)(A)–(B).  Congress left no room for states to tinker with the parameters of the federal law.  Nor is there space for states to add their own enforcement mechanisms to the two exclusive enforcement pathways spelled out in the federal statute.

85.  Field preemption also exists when a federal interest is so dominant that it must be assumed the federal system precludes enforcement of state laws covering the same subject.  The

federal interests in overseeing and enforcing the 340B Program could hardly be more dominant. Congress directed HHS to create an exclusive and comprehensive remedial scheme, which allows for federal enforcement as well as private ADR claims "to prevent overcharges and other violations of the discounted pricing requirements" and to govern disputes over 340B discount pricing.  42 U.S.C. §§ 256b(d)(1)(A), (d)(2)(A), (3); 42 C.F.R. §§ 10.3, 10.20.  State statutes that seek to adjust and enforce the federal 340B law are "incompatible with the [340B] statutory regime." *Astra*, 563 U.S. at 113.

86.     S.B. 28 also is preempted because it imposes a substantial obstacle to the achievement of federal purposes and objectives under the 340B statute.  The Kansas law requires manufacturers to provide the federal 340B discount on an unlimited number of transactions involving contract pharmacies.  Several federal courts (including the Third Circuit, the D.C. Circuit, and the District Court for the District of Columbia) have held that federal 340B law intentionally does *not* require manufacturers to recognize an unlimited number of contract pharmacies.  Yet that is precisely what Kansas's S.B. 28 purports to mandate, greatly expanding the scope of the federal discounting obligation in conflict with federal law.

87.     S.B. 28 also conflicts with the federal 340B enforcement process by purporting to create its own state-level 340B enforcement mechanism.  Congress created two exclusive pathways to resolve disputes arising under the 340B statute: (i) direct enforcement by federal agencies, and (ii) an Administrative Dispute Resolution process that serves as the exclusive means for regulated entities to bring narrow types of private claims relating to 340B law.  Congress gave no authority to the States to administer, interpret, or enforce any aspect of the 340B Program.  Yet S.B. 28 purports to do exactly that.

**COUNT II**
**(Declaratory/Injunctive Relief—**
**Preemption By Patent Law and Laws Governing Drug Exclusivity Periods)**

88.     Novartis realleges, reasserts, and incorporates by reference herein each of the foregoing allegations as though set forth fully herein.

89.     The Supremacy Clause of the U.S. Constitution provides that Federal law is "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

90.     S.B. 28 is preempted by the federal laws governing drug patents and federal drug exclusivity periods.  By reducing the value of the exclusivity periods and patent terms that the FDCA and federal patent laws guarantee to qualifying drug manufacturers, S.B. 28 interferes with the careful balance of rewards and incentives that Congress crafted—a framework in which states simply play no role.

**<u>PRAYER FOR RELIEF</u>**

For the foregoing reasons, Novartis prays for the following relief:

A.     A declaration pursuant to 28 U.S.C. § 2201 that S.B. 28 is preempted by federal law and is thus null, void, and unenforceable;

B.     Preliminary and permanent injunctive relief vacating S.B. 28 and enjoining Defendant from implementing and/or enforcing S.B. 28 against Novartis or any of its affiliates, officers, agents, representatives, or contractors;

C.     Preliminary and permanent injunctive relief enjoining Defendant from seeking civil penalties, equitable relief, or any other remedy based on an alleged violation under S.B. 28 by Novartis or any of its affiliates, officers, agents, representatives, or contractors;

D.     An order awarding Novartis attorneys' fees, costs, and expenses, as appropriate;

and

E.       Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: July 30, 2024

*/s/ Michael J. Kuckelman*

Michael J. Kuckelman          KS Bar No. 14587
Michael T. Crabb              KS Bar No. 24395
**KUCKELMAN TORLINE KIRKLAND, INC.**
10740 Nall, Suite 250
Overland Park, KS 66211
T: (913) 948-8610  /  F: (913) 948-8611
mkuckelman@ktk-law.com
mcrabb@ktk-law.cm

Catherine E. Stetson*
Susan M. Cook*
Marlan Golden*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5600
cate.stetson@hoganlovells.com
susan.cook@hoganlovells.com

*Pro Hac Vice Motion Forthcoming*

***Attorneys for Novartis Pharmaceuticals
Corporation***

## **VERIFICATION**

I, the undersigned, having read the allegations of the foregoing Verified Complaint, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual allegations asserted in the Verified Complaint are true and correct.

Executed this 29th day of July, 2024.

Odalys Caprisecca